# Birmingham Water Works Company v. Keiley.

*Damages for Cutting off Water.*

(Decided Nov. 23, 1911.   Rehearing denied Dec. 14, 1911.
56 South. 838.)

1. *Waters and Water Courses; Public Supply; Contract; Rates.*— The contract in this case stated and examined and held not to authorize a charge of 30 cents per thousand gallons by meter rate at the residence such as the one considered, but that the proper charge was at a rate not exceeding the flat rate for residences of the size here denoted.

2. *Same; Shutting Off Supply; Damages; Breach; Evidence.*— Where a defendant water company in order to coerce a consumer to pay an unauthorized demand for water service contrary to its contract to furnish water at a specific rate, shut off plaintiff's water supply and put plaintiff and his family to inconvenience, hardship and expense, there was evidence justifying the imposition of punitive damages.

[Birmingham Water Works Company v. Keiley.]

3. *Same; Breach of Duty; Action.*—Where the municipality made a contract with a water company to supply its inhabitants with water at a specified rate, such contract was for the benefit of all the inhabitants who were willing and able to pay the rate specified and to comply with reasonable regulations; hence, one whose water was wrongfully turned off was entitled to sue to recover damages for breach of the water company's duty in his own name.

4. *Damages; Actual; Punitive.*—Actual damages are such as are recoverable at law from a wrong doer by the injured party as a matter of right as compensation for the actual loss sustained by him by reason of the wrong; punitive damages are such damages over and above actual damages, as will compensate the person for his actual loss, the imposition of which the law permits in proper cases at the discretion of the jury, not because the party injured is entitled to them as a matter of right, but as a punishment to the wrong doer and to deter him and other engaged in the same business from such wrong doing in the future.

5. *Same; Exemplary Damages; Discretion of Jury.*—Where exemplary damages are allowable, the amount is in the discretion of the jury subject to revision by the court for manifest injustice or error.

6. *Same.*—Exemplary damages are recoverable not only for acts maliciously perpetrated, but also in cases where the defendant knowingly, wantonly or recklessly does an act fraught with probable injury to person or property, and ultimately producing such injury or damage.

7. *Same; Jury Question.*—Where there is evidence to warrant the imposition of exemplary damages, it becomes the duty of the court to submit the question to the jury as the sufficiency of the evidence is for the jury alone.

APPEAL from Birmingham City Court.

Heard before Hon. C. W. FERGUSON.

Action by W. R. Keiley against the Birmingham Water Works Company for damages for shutting off water. Judgment for plaintiff and defendant appeals. Affirmed.

LONDON & FITTS, for appellant. The contention of plaintiff as to the meaning of the contract cannot be sustained for the right of a water company to cut off water because of the consumer's failure to pay is everywhere recognized.—*B. W. W. Co. v. Ferguson,* 164 Ala. 494; *B. W. W. Co. v. Vinter,* 164 Ala. 490; 45 Barb. 136; 48 Mo. App. 273; 24 Pac.

439; 29 Pac. 320. The plaintiff was not, under the evidence, entitled to recover punitive damages, and the court, therefore, erred in its oral charge, and in refusing written charges 12 to 14, inclusive.—*W. U. T. Co. v. Westmoreland*, 151 Ala. 326; *Wilkinson v. Searcy*, 76 Ala. 176; *Leinkauf v. Morris*, 66 Ala. 406; 21 How. 412; Sutherland on Damages, p. 1096. Counsel insist that under the contract made with the city, the defendant had no right to bring an action in his own name for a breach thereof.

BONDURANT & SMITH, for appellee. The court properly construed the contract.—*Brown v. B. W. W. Co.*, 52 South. 915; *State ex rel v. B. W. W. Co.*, 51 South. 354; *Birmingham v. B. W. W. Co.* 42 South. 10. The evidence authorized the imposition of punitive damages, and the amount was within the discretion of the jury.— *A. G. S. v. Sullivan*, 9 South. 376; *Wilkerson v. Searcy*, 76 Ala. 176; *R. R. Co. v. Frazer*, 9 South. 303; *Smith v. B. W. W. Co.* 16 South. 126.

DE GRAFFENRIED, J.—The appellant, a public service corporation with its principal office in the city of Birmingham, Ala., made with the municipality of Graymont, then a suburb of Birmingham, a contract to supply its residents with water, the parts of which relevant to this controversy were as follows:

Flat Rates.

Private dwellings of three (3) rooms or
    less _____$6.00 per annum
For each additional room in private
    dwelling up to and including ten
    (10) rooms _____ 1.00 "  "
For each additional room in private
    dwelling over ten (10) rooms_____ .50 "  "

Water closet for private family, for first
closet _____ 5.00 " "
For each additional closet for same fam-
ily or servants _____ 2.50 " "
Bath tubs for private family, each\_\_\_\_\_ 4.00 " " .

A dwelling in the rear of a premises occupied by a person or persons not employed as servant or servants on the premises shall be charged for as separate dwelling, whether or not there are water fixtures for the sole and individual use of its occupants.

Boarding or lodging house in addi-
to the above room rate, for each
boarder or lodger_____\$  1.50 per annum
Store, according to size and
occupation _____\$12.00 to $100.00 " "
Drinking saloon _____ 25.00 to  100.00 " "
Restaurant _____ 25.00 to  100.00 " "
Printing office, not including
use steam engine_____ 20.00 to   60.00 " "
Bank _____ 12.00 " "
Photograph Gallery _____ 12.00 to   50.00 " "
Bakery _____ 20.00 to   50.00 " "

  *     *     *     *     *     *     *     *     *

Cows, each _____ 1.50 " "

### Meter Rates.

(Subject to the minimum charges and meter rents here-
inafter provided for.)

For a daily consumption of 1,000 gal-
lons _____$.30 per 1,000 gals.
For a daily consumption of 1,000 to
1,500 gallons _____ .27½ " " "
For a daily consumption of 1,500 to
2,000 gallons _____ .25 " " "
For a daily consumption of 2,000 to
3,000 gallons _____ .22½ " " "

For a daily consumption of 3,000 to
   4,000 gallons _____ .20   "   "     "

     *     *     *     *     *     *     *     *     *

The rates provided for in this section are subject to the modifications and provisions of sections fourteen, fifteen, sixteen, and eighteen of this ordinance. Water rents shall be payable at grantee's Birmingham office. Failure to pay water rent when due shall entitle grantee to the right to discontinue water service until the amount due has been paid, together with a fee of fifty (50) cents for turning off and turning on the water.

Section 14. That grantee shall have the right to set a meter on any service line, whether it be used for domestic or any other purpose and notwithstanding a specific or annual rate may be named therefor herein; and charge for use of water according to the meter schedule provided in this ordinance, and any water consumer shall have the right to require grantee to set a meter on his service pipe and to pay for water service by meter measurement, provided that each and every water consumer supplied by meter measurement shall pay a minimum monthly charge for water privileges of at least one ($1.00) dollar, or a minimum quarterly charge for water privileges of at least three ($3.00) dollars; in cases where a one-half inch or five-eighths inch meter is used, except that in no event shall the minimum monthly or minimum quartely charge for water privileges by meter exceed the flat rate charge for the same period."

The above contract nowhere provides—certainly not in express terms—a meter rate for water consumed in quantities of less than 1,000 gallons daily, but a flat rate is expressly provided for residences of every kind.

The appellee was a resident of Graymont, and occupied a five-room residence without bathtub or sanitary

connections, and he kept a cow. He became a customer of appellant, and under the above flat rate was chargeable with $8 per annum for his residence and $1.50 for his cow, making $9.50 per annum, or $2.37½ per quarter. In February, 1909, the appellant, without the request of appellee, placed a five-eighths inch meter at his house. There seems to have been no trouble between the appellant and appellee until October 1, 1909, and the record fails to inform us whether, after February and before October, appellant's quarterly charge was $2.37½ or $3. We conclude that it could not have been greater than $3 per quarter, because the efforts of appellant to collect more than that amount in October brought on this litigation. The appellant made, not monthly, but quarterly collections, and on October 1, 1909, for the previous months of July, August, and September presented appellee with a bill for $8.75, an excess of $5.75 over the amount which appellee conceded he should be required to pay. Appellee had made no agreement to pay $8.75 for the water supplied to him during the previous July, August, and September, and appellant claimed that sum of appellee because during said period he had used at his residence 29,250 gallons of water, which at 30 cents per 1,000 gallons amounts to $8.75. During the period covered by the controversy, appellee's family consisted of his wife and three children. They kept no servants, and appear to have done their own cooking and housework. The water was used for washing, cooking, and other household purposes. On the back porch was a small churn, and this churn was run eight or ten minutes each day, six days during the week, with water supplied through a one-sixteenth inch pipe and conveyed from the churn into the trough where the cow drank, and from there into an alley. When the bill

for $8.75 was presented to appellee, according to his testimony, he saw the clerk of appellant, to whom he had previously been accustomed to make his payments, and offered to pay him $3 for the previous quarter, stating that he did not owe the other $5.75, but the clerk declined to receive it. He then saw, according to his testimony, the agents of appellant in its Birmingham office, and, to use his language, "insisted that there was a contract in effect, and that it was being violated, and insisted upon their getting the contract, and entering into a discussion with me for the purpose of seeing if we could not come to some kind of understanding," but without avail. He saw the general manager of appellant; and, to again use his language: "I went into his private office and told him that there was a little difference existing between the Birmingham Water Works Company and myself, and that I supposed none of the bookkeepers or clerks would be authorized to regulate or handle it. In that conversation I tendered Mr. O'Connell the $3. He said that if the bookkeeper *had rendered a bill for $8.75 that would be the amount I would have to pay or the water would be turned off."* He further testified that in two hours after that the water was turned off; that for about three weeks he and his family suffered the expense and inconvenience necessarily resulting from the loss of the right to use appellant's water; and that he finally paid under protest, the $8.75, and the water was again supplied to him.

1. It is manifest that appellant had no right to collect of appellee more than $3 for the quarter ending October 1, 1909, and that the extra charge of $5.75 was unauthorized and illegal. It is not necessary for us to determine whether the clause in the contract which provides "that each and every water consumer supplied by

meter measurement shall · pay a minimum monthly charge for water privileges of at least one dollar or a minimum quarterly charge for water privileges of at least three dollars in cases where a five-eighths inch meter is used, except that in no event shall the minimum monthly or minimum quarterly charge for water privileges by meter exceed the flat rate charge for the same period," authorized appellant to charge appellee $3 per quarter, instead of the flat rate of $2.37½. Appellee conceded the justice of the charge of $3, and tendered that amount to appellant before the water was cut from his premises, and that question is not before us. Neither are we called upon to determine whether a private dwelling which consumes more than 1,000 gallons of water daily can be by the installation at such residence of a meter by appellant required to pay more for the water it uses than is fixed under said contract by the *flat* rate, for that question is also not before us. What we *do determine* is that the meter rate of *30 cents per 1,000 gallons does not apply,* under the contract, to a residence whose occupants keep a cow and who do not consume as much as *1,000 gallons of water daily* by meter. measurement. To hold otherwise would be to place words in the contract which the makers did not place in it. The contract was carefully drawn, and was evidently written after the Supreme Court had rendered the opinion in the case of *Smith v. Birmingham Waterworks Company,* 104 Ala. 315, 16 South. 123, in which appellant's contract with the city of Birmingham was construed, and in which it was determined that *flat,* and not *meter,* rates, apply to *all* the residences of Birmingham. In view of the language and reasoning of the Supreme Court in that case and in the subsequent case of *Birmingham Waterworks Co. v. Truss,* 135 Ala. 530,

33 South. 657, we would do violence to the contract made by the municipality of Graymont with appellant if we undertook to read into it a provision authorizing appellant to collect *any meter rate* from the occupants of a private residence, using less than 1,000 gallons of water daily. Certainly, as to such residences, it was contemplated by the makers of the contract that the *flat* rates would furnish sufficient compensation to appellant for the service rendered, and appellant is *not without remedy* in case any of its customers abuse the privileges to which they are entitled under the contract. —*Smith v. Birmingham Waterworks Co., supra; State ex rel. v. Birmingham Waterworks Co.,* 164 Ala. 586, 51 South. 354, 27 L. R. A. (N. S.) 674 137 Am. St. Rep. 69; *Brown v. Birmingham Waterworks Co.,* 169 Ala. 230, 52 South. 915.

It follows from what we have above said that the appellee was entitled to the general charge which the court gave to the jury in his behalf at his written request.

2. The only other question, as we read the record, before the court, is whether there was evidence before the jury which, if believed, authorized the jury in its discretion to impose exemplary damages. *Actual* damages are recoverable at law, out of a wrongdoer by the injured party *as a matter of right* as *compensation* for the actual loss sustained by him by reason of such wrong. Punitive damages are damages *over and above* such sum as will compensate a person for his actual loss, and the law permits their imposition, in proper cases, at the *discretion of the jury,* not because the party injured is entitled to them as *matter of right,* but as *punishment* to the wrongdoer, and to deter him and others in *similar* businesses from such wrongdoing in the future.—*Oliver*

*v. Columbia, N. & L. R. R. Co.,* 65 S. C. 1, 43 S. E. 307; 7 Words and Phrases, 5851.

The amount of such exemplary damages, when allowed by a jury, in a proper case, is also left to their discretion, subject to revision by the court for manifest injustice or error.—*Western Union Tel. Co. v. Seed,* 115 Ala. 670, 22 South. 474; *Mobile Furniture Co. v. Little* 108 Ala. 399, 19 South. 443.

3. In the case of *Lienkauf & Strauss v. Morris,* 66 Ala. 406, the Supreme Court says on the question as to when, in the discretion of the jury, exemplary damages are properly allowable: "We deduce from the authorities the doctrine to be that exemplary damages are allowable, not only for acts *maliciously* perpetrated, but also in cases where one *knowingly, wantonly,* and *recklessly* does an act fraught with probable injury to person or property, and ultimately producing such injury or damage. Such a spirit must be considered as at war with that *good faith* which ever preserves a just regard for the rights of others." "Where there is no malice connected with the wrong complained of, or such *gross negligence* or *oppression* or *fraud* as amounts to malice, the compensation or amount of damages should be confined to the actual injury and its immediate effects."— *Wilkinson v. Searcy,* 76 Ala. 176. "Malice in law is not necessarily personal hate or ill will, but it is that state of mind which is *reckless of law* and of the *legal rights of the citizen."—Willis v. Miller* (C. C.) 29 Fed. 238. The above-quoted language, in which the italics are ours, correctly and concisely states the conditions which must exist when exemplary damages may or may not in the discretion of the jury be imposed.

4. Was there *evidence* in the case *tending* to warrant the imposition of exemplary damages by the jury? If

so, it was the *duty* of the court to submit the question to the jury, as the *sufficiency* of the evidence on the subject was for the *jury alone.*—13 Cyc. 118.

The position and relative obligations of the parties to each other at the time of the act complained of should be of service in determining this question. Water, one of the necessaries of life, is now almost universally supplied to the inhabitants of cities and towns through the medium of the public service corporation. Surface water in cities and towns is notoriously subject to contamination, and is, for that reason, often dangerous. The water service which was denied by appellant to appellee was of importance to him, and its denial, according to his testimony, put him and his family to inconvenience, hardship, and expense. Appellee tendered to appellant all that was due it, and, if his testimony is to be believed, he was not only legally entitled to the service which was denied to him, but he did more than the law required him to do to retain his water connections. It is true that the appellee, by paying the entire amount of the disputed bill, under protest, before the water was cut off from his premises, could have forced the appellant to continue its service while he litigated with it the correctness of the account, but this course was not required of him by the law. For the law to require such a course would be, as said in *Wood v. Auburn,* 87 Me. 293, 32 Atl. 908, 29 L. R. A. 376, "to violate the fundamental juristic principle of procedure. That principle is that the claimant, not the defendant, shall resort to judicial process."

The appellant certainly has the legal right, by the punitive power of discontinuing its service, to coerce out of unwilling or laggard debtors the payment of its just demands. On account of the number of its cus-

tomers, the character and size of many of its accounts, and, in fact, the necessity of such authority for the orderly conduct of its business, the law should and will be swift in upholding appellant in the legal and orderly exercise of that power. But the law has not conferred judicial authority upon appellant, or the right, by its punitive power of discontinuing its service, to coerce payment of a demand not just. We think that there can be no dispute about the soundness of the proposition that when the correctness of a bill of a public service corporation is disputed by one of its customers and the company, by reason of the failure of such customer to pay such bill, discontinues its service, it does so at its peril, and, if in the wrong, is liable to compensatory damages in any event, and, when the circumstances justify it, to punitive damages. To use the language of Mays, J.: "It is a public service corporation, monopolistic in its nature, and the patrons have no choice but to accept its service, and they have not the privilege of selecting to do business with a competitor, because there is no competitor, and for this reason the rights of the public should be carefully guarded against oppressive methods used for the purpose of collecting unjust demands. The necessities of the law must meet modern conditions."—*Telegraph Co. v. Hobart,* 89 Miss. 252, 42 South. 349.

It is true that appellant insists that it acted in good faith in this matter, and under an honest misconception of its rights. The appellant *did not act* under a *mistake of fact.* If there was a *mistake or misconception,* it was not one of *fact but one of law.* The courts were open to it for a judicial construction of any doubtful clause in its contract, and it could have invoked the aid of the courts for that purpose without severing its

[Birmingham Water Works Company v. Keiley.]

relations with the appellee. It therefore appears to us that the question, under all the evidence, as to whether the appellant, when it severed its relations with appellee, did so in good faith, or in that state of mind which is reckless of law and the legal rights of others, knowing, at the time, that its act was fraught with probable damage to appellee (which damage, by reason of such act, *did occur* to appellee), was one for the jury, and we are therefore of opinion that the court below committed no error in submitting to the consideration of the jury the subject of punitive damages.

5. The appellee, with leave of the court, withdrew the third count of his complaint, and there is nothing, therefore, in the assignments of error relating to that count, as it was not a part of the record when the case was tried.

6. As the contract was made by the municipality of Graymont for the benefit of its inhabitants, and as the contract made it the *duty* of appellant to supply all of the inhabitants of the municipality with water who were willing and able to pay its water charges and comply with its reasonable regulations, the appellee had a right to sue for a breach of such duty in his own name. —*Smith v. Birmingham Waterworks Co.*, 104 Ala. 315, 16 South. 123; *Birmingham Waterworks Co. v. Truss*, 135 Ala. 530, 33 South. 657; *State ex rel. v. Birmingham Waterworks Co.*, 164 Ala. 586, 51 South. 354, 27 L. R. A. (N. S.) 674, 137 Am. St. Rep. 69.

There are many assignments of error on the record, but the above disposes of all the assignments which are insisted upon, and as we find no error in the record, the judgment of the court below is affirmed.

Affirmed.