CAPITAL ELECTRIC POWER ASSOCIATION *v.* HINSON

No. 40404 March 4, 1957 92 So. 2d 867

*Prewitt & Bullard,* Vicksburg; *William Harold Cox,* Jackson, for appellant.

*Teller & Biedenharn, Geo W. Rogers, Jr.,* Vicksburg, for appellee.

HALL, J.

This appeal is from a judgment of the Circuit Court of Warren County entered on the verdict of a jury in two suits brought by appellee against appellant for the recovery of damages, which suits were by agreement consolidated for trial.

The first suit was filed on August 25, 1954, seeking damages for the cutting and destruction of 67 trees on the lands of the plaintiff, and was in four counts, one

being for the statutory penalty, one being for a willful trespass and appropriation of private property, seeking actual and punitive damages, one being for the actual value of the timber, and one being for a wrongful representation to appellee's neighboring landowner that she was depriving him of electric power and service.

The second suit was filed on September 15, 1954, alleging ownership of the same land, the renting thereof to Mrs. Gertrude McGuffee on August 21, 1954, at a monthly rental of $30.00 per month to commence on September 1, 1954, on condition that the said Mrs. McGuffee would have electric service in the house situated on said premises; that said house had been served with electricity for a considerable number of years past but had been disconnected by the appellant; that on or about August 30, 1954, the said Mrs. McGuffee made proper application to the appellant to be served with electricity at the home on said land and paid all fees required in advance and agreed to all of the terms imposed by appellant as a condition to having the meter connection immediately made to said premises; that later on the same date the appellant advised her that no electricity would be furnished to Mrs. Hinson or to any tenant of hers or to any other person occupying the home on said premises, as had formerly been done, until and unless Mrs. Hinson dismissed a suit which she had brought against the appellant and that, notwithstanding its initial commitment to Mrs. McGuffee the appellant returned her deposit and has arbitrarily and unlawfully declined to make any electric connection to said premises. The declaration further alleged that there was then pending the aforesaid suit filed on August 25, 1954, that appellee, as an American citizen, has a right to present her grievances to the court and to have them passed on; that the actions of appellant in declining to furnish electricity to said home unless plaintiff dismissed her lawsuit were unlawful, arbitrary and capricious and

were actuated by malice and ill will; that the appellant serving said area had no right to make such a requirement as a condition to making electrical service available and that the same infringed upon and destroyed her basic rights and liberties; that Mrs. McGuffee, not being able to get electricity, has not begun the occupancy or rental of appellee's property and that appellee has been put to great trouble, inconvenience, hardship and humiliation thereby and has lost in the rental of her property from September 1, 1954, to the time of the filing of said suit and is entitled to recover not only actual damages but also punitive damages.

In the case of Capital Electric Power Assn. v. Mrs. Gertrude McGuffee, 83 So. 2d 837, not yet reported in the State Reports, there was involved by virtue of a suit for injunctive relief and damages to Mrs. McGuffee and her husband the wrongful refusal of appellant to furnish electric service to them because of pending litigation by Mrs. Hinson against the appellant. In that case we referred to Chapter 184, Laws of 1936, known as the ''Electric Power Association Act'', and we held that the appellant organized under said act was vested with many of the attributes of public service corporations, and that persons living along the routes served by such association and readily accessible to its existing lines, who apply for membership in the association and agree to use electric energy supplied by the association are entitled to have such electric service furnished to them upon a nondiscriminatory basis. We further held that an order of the board of directors of appellant adopted January 10, 1945, which provided that ''the manager shall be instructed not to render electric service to property while in litigation'' was unreasonable, arbitrary and discriminatory, and afforded no justification for appellant's refusal to supply electric energy for the McGuffees on the ground that Mrs. Hinson had filed an action for damages against the appellant for

the wrongful cutting of timber on her land, and we further held that there was no error in the action of the chancellor in holding that the McGuffees were entitled to have electric service restored in the dwelling house which they had rented from Mrs. Hinson.

In the case of Capital Electric Power Assn. v. Mrs. Emma Hinson, 84 So. 2d 409, not yet reported in the State Reports, we had before us the record on the trial of the first declaration involved on this appeal as hereinbefore set out. It developed upon the trial of that case in the lower court that the appellant claimed the right to cut the trees by virtue of an easement which had been granted to the appellant in 1938 by W. O. Aldridge and wife, who were then the owners of the land in question and the predecessors in title of Mrs. Hinson, and we discussed in detail the rules of law applicable to such easements and held that the easement in question did not grant an unlimited right to extend the power line beyond the point of its original construction. We held that Mrs. Hinson was entitled to a peremptory instruction for the actual value of the trees cut by appellant but was not entitled to a directed verdict for the statutory penalty, but that the easement should be admitted in evidence on the issue of good faith, not as evidence of appellant's right to cut the trees, for appellant had no such right, but for what it would be worth to the jury on the issue of good faith, and the cause was remanded to the lower court for another trial.

After the remand of the last mentioned case, it was consolidated, by agreement, as above outlined with the suit filed on September 15, 1954, and the jury returned a verdict in favor of the plaintiff for the sum of $7,000.00 from which this appeal is prosecuted. The jury did not undertake to separate the actual damages awarded from the punitive damages awarded and it is evident that the verdict covers both actual and punitive damages.

The general manager for the appellant testified that appellant had the easement from W. O. Aldridge but that he made no investigation before the timber was cut as to whether Aldridge still owned the land, that appellant had been servicing Mrs. Hinson since 1945 but did not know that she owned the land. The general manager approved a sketch of the power line extension as prepared by appellant's staking engineer. The line was to run beyond its present location a distance of 475 feet in one direction and an additional distance of 175 feet in another direction across Mrs. Hinson's land, and it was for the purpose of building a line on down to the property of Mr. R. J. Sanders so as to service his home and the homes of six other families. The staking engineer said that he knew that the owner of the land was the only one who could give consent to this extension. He inquired of a Mrs. Scarbrough, who was a tenant occupying Mrs. Hinson's property, as to whether there was any objection to the extension of the line and she said that she knew of no objection to it, but the staking engineer did not ask her who was the owner of the place and she did not tell him. Shortly afterward Mrs. Scarbrough left Mississippi and moved to Arkansas and was not available at the trial. The staking engineer requested Sanders to ascertain the name of the owner who promised him that he would find out and let him know, but apparently Sanders never made any report to the staking engineer or to the appellant before the trees were cut and the staking engineer did not advise the appellant that he had obtained the permission of the owner.

According to the general manager, the first knowledge that appellant had that Mrs. Hinson was the owner of the property was when he received a letter from her attorney after the trees had been cut. The general manager further testified that Mrs. McGuffee's application and deposit were made to the company's office while he was absent from the office but on his return to the of-

fice on the same date he refused to restore the service to the house and notified Mrs. McGuffee within 3 hours that the appellant would not serve her and further that Mrs. Hinson was notified that nobody was going to get any electricity on her place so long as her suit was pending. He testified that nobody could get any electricity on that place until the chancery court of Warren County made him restore it, and that after the chancery court had entered a temporary mandatory injunction requiring restoration of the service to Mrs. Mc-Guffee, the company then made the installation. He also testified that after Mrs. McGuffee moved out of the place the appellant refused to serve Mrs. Hinson and she had to resort to a suit in the chancery court and obtain a mandatory injunction to require the appellant to restore the service to her. When Mrs. Hinson's attorney talked to the general manager, he did not mention there being an easement for a power line on the place but frankly admitted that he kept the easement under cover. The appellant has between 5,000 and 7,000 easements on the same printed form but none of them have ever been recorded.

Mrs. Hinson testified and established her title to the property beyond question by recorded deeds. She and her husband had lived in the house on this property from 1945 to 1952, during all of which time they had electric service from the appellant. She rented the property to the Scarbroughs in 1954 and they moved to Arkansas in June 1954. The first she knew of the trees being cut was when her husband went by the place and saw the cutting. Nobody ever asked her permission to cut any of the trees. She agreed to rent the property to Mrs. McGuffee at $30.00 per month beginning September 1, 1954, but Mrs. McGuffee did not move in then because she could not get electricity. The appellant notified her on August 30, 1954, that they would not serve Mrs.

McGuffee because she, Mrs. Hinson, had a suit against them and she lost a month's rent on account thereof.

Mrs. McGuffee testified that she rented the house in August and drove to the company's office with her husband at Clinton, Mississippi, and requested connection for the lights and made a deposit thereon and was advised that the lights would be turned on as soon as the company could do so, but by the time they got back home the company had called and told her children that they weren't going to get any electricity and requested that she call Mr. Allen, which she did, and he told her that she could not have any electricity because of Mrs. Hinson's suit against the company, so she did not move in on September 1st, but went into chancery court and filed an injunction suit and obtained a mandatory injunction against the company, after which electricity was connected to the house and she and her husband moved in about two or three days before October 1st.

 █ Appellant contends first that the trial court erred in refusing to grant a peremptory instruction requested by it. On the former appeal in the Hinson case, supra, we held that Mrs. Hinson was entitled to a directed verdict for the actual value of the trees cut, and we further held that the question of the recovery of the statutory penalty was for the jury. As to those two items the former opinion is the law of the timber cutting case and it is quite clear that the appellant was not entitled to a peremptory instruction thereon.

 █ The appellant next contends that the trial court erred in authorizing the jury to award punitive damages in the second case. Its first contention in this connection is that no actual damages were shown to have been directly sustained by Mrs. Hinson and that consequently she could not recover punitive damages. It is undisputed that Mrs. Hinson lost one month's rent in the amount of $30.00 because of the wrongful refusal of appellant to furnish electric service to her tenant, Mrs. McGuffie.

The contention that no actual damages were shown is wholly without merit.

 The second contention under the second point is that this is an action for damages for a breach of a contract and that no punitive damages are recoverable for the breach of a contract. Without deciding that punitive damages can not be recovered for the breach of contract, it is clear from the foregoing statement of facts that this is an action in tort and not in contract. In 52 Am. Jur., Torts, Sec. 2, page 362, it is said:

"A tort is sometimes defined as a wrong independent of contract, or as a breach of duty which the law, as distinguished from a mere contract, has imposed. Generally speaking, a tort is a wrong, and a tortious act is a wrongful act. A tortious act has also been defined as the commission or omission of an act by one, without right, whereby another receives some injury, directly or indirectly, in person, property, or reputation. Although the same act may constitute both a crime and a tort, the crime is an offense against the public pursued by the sovereign, while the tort is a private injury which is pursued by the injured party."

The actions heretofore detailed show that appellant was guilty. of a breach of duty, which the law, as distinguished from a mere contract, has imposed. It is a wrong committed without any right whatsoever and the appellee was injured thereby. See also the case of D. L. Fair Lbr. Co. v. Weems, 196 Miss. 201, 16 So. 2d 770, to which we will refer later herein.

In Stokes v. Newell, 174 Miss. 629, 641, 165 So. 542, it was held: "It is a general principle of law that the breach of a legal duty owed by one person to another when damages have resulted therefrom gives the right to a cause of action. This form of action is called in law a tort. Section 24 of the State Constitution provides that every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course

of law, and right and justice shall be administered without sale, denial, or delay. Of course the injury referred to must be a legal injury."

Appellant's third position under its second point is that under the general rule applicable to similar situations involving public utilities this Court has uniformly and invariably held that punitive damages are not allowable. We think that argument is answered by the case of Vicksburg Water Works Co. v. Dutton, 98 Miss. 209, 53 So. 537, where the Water Works Company, because of the gross inattention to duty of an employee in its office disconnected a customer's premises from its water mains and this Court held that the question of its liability for punitive damages was for the jury although the Company's manager, on discovering the facts within four hours, admitted the mistake and offered to reconnect the premises and the customer refused the offer.

In the case of Yazoo & M. V. R. R. Co. v. Williams, 87 Miss. 344, 39 So. 489, this Court held: "It is the firmly established doctrine in this state that punitory or exemplary damages are always properly allowed where the trespass complained of or the breach of duty committed was malicious, wanton, willful, or capricious. Telephone Co. v. Cassedy, 78 Miss. 670, (29 South. Rep., 762). It is also well settled in this state that punitory damages are not awarded solely out of regard for the individual injured, but chiefly on account of a desire to protect the public and deter the repetition of such actions. Wagner v. Gibbs, 80 Miss., 63 (31 South. Rep., 434; 92 Am. St. Rep., 598); Railroad Co. v. Mattingly (Miss.), 37 South. Rep., 710. It is the long settled and uniformly adhered to rule in our jurisprudence that the amount of such punitory or exemplary damages is solely within the discretion of the jury, and, no matter what the sum of their finding might be, interference therewith, unless for exceptional causes, is discouraged—New Orleans, J. & G. N. R. Co. v. Hurst,

36 Miss. 660 (74 Am. Dec. 785); the reason being that, as the jury are the sole judges of the amount which ought properly to be assessed in order to inflict adequate punishment, the courts should scrupulously avoid any undue interference with their prerogative. This is the rule elsewhere, and is accepted as the sound principle by the most noted text writers. See Sedgwick on Damages, secs. 388, 1318; Sutherland on Damages, sec. 1092; Thompson on Trials, sec. 2065. * * *

"There is no inflexible guide by which the jury can be conducted to their determination of the amount of the penalty which must be inflicted to adequately punish the culprit and protect the public. They hear the testimony, and if the case be one which legally warrants the infliction of exemplary damages, they, in the exercise of their own unconstrained discretion, decide whether they will impose any penalty. They cannot be directed or required to award any sum in punitory damages, no matter how flagrant the transgression of private or public right may be in the mind of the court. Neither, in cases where such damages are permitted, can their province of assessing such sum as they may think proper be invaded. They may refuse to award any sum in punitory damages, without regard to the evidence. They cannot do this in actions for compensatory damages; for in that class of cases, where the damages are shown, the jury may be peremptorily instructed to find for the party injured and assess actual or compensatory damages. So, in a case of punitory damages, where they decide that punishment shall be inflicted, the jury are the sole judges and may inflict such damages as they 'see fit', sufficient to protect the public and deter the wrongdoer.

"It is suggested in argument that the wealth of the wrongdoer may be shown in evidence, in order to permit the jury to consider that wealth in determining the amount of punitory damages to be awarded. This is true, but only upon the idea already advanced—that the jury

may gauge the amount of the punishment necessary to be inflicted in order to deter a repetition of the offense; but it is in no proper sense introduced as testimony to influence the verdict. Evidence of the wealth of the wrongdoer is not admitted as tending even remotely to sustain the cause of the plaintiff. It becomes admissible only after proof first made that the trespass or injury complained of was committed wantonly, maliciously, willfully, or capriciously. Poverty or wealth becomes important, not as affecting liability—for the poor man may be as guilty of wrongdoing as the millionaire—but as assisting the jury in affixing the punishment; for what would be a mere bagatelle to the latter might sweep away the entire estate of the former.''

In the case of D. L. Fair Lbr. Co. v. Weems, supra, we said: ''On the question of punitive damages, the affirming judges are of the opinion, as hereinbefore indicated, that the owner of the timber standing on the land of another owes the latter the duty to use reasonable care in removing the timber so as not to injure the other's property; and this duty is owed likewise to a tenant of the landowner so far as concerns the possession and use of tenant. The obligation is one put in or raised by the law and results from the relation of the timber owner and the owner of the land at the time of the removal of the timber, without the necessity of any contract between them so prescribing. The duty, moreover, is nondelegable, else the timber owner would have the power to place its performance in the hands of a party wholly without moral or financial responsibility and thus strip the landowner of any effective remedy for violation of the stated duty, however gross and oppressive, other than a recourse to the nonlegal preventive remedy of force and violence.''

In the case of Southwestern Gas & Electric Co. v. Stanley, 45 S. W. 2d 671, (674), the Court of Civil Appeals of Texas had under consideration a case where

the power company, because a customer was in default on the bill due by his place of business, cut off the power not only at the business establishment but also in his residence and in passing upon a suit for damages for this wrongful act the Court said: "Manifestly one party cannot compel the other affirmatively to do something which the contract does not require of him. It follows that the appellee, having a right to insist on full performance of the contract according to its terms as respects his residence, owed the appellant company no duty and the appellant company could not require him to pay the garage bill as a means to prevent the damages occasioned without his fault in cutting off the electricity from his residence. To so require the appellee to do would, in effect, be forcing him to abandon his legal right and waive damages that may arise from the breach of contract or tort and be converting his right into a coercive way of merely paying debts entirely apart from the particular contract. * * *

"The action was one sounding in tort and not purely a breach of the terms of a contract. The petition alleged the facts which show, as does the undisputed evidence on the trial, that the act of cutting off the electricity from the residence was not in virtue of terms of contract, but wholly independent of and against the contract. The requisite elements of a tort were clearly shown. And the motive for the act and the coercive purposes for which it was committed authorized the assessing of exemplary damages. The testimony of the manager reflects the undisputed facts that: 'I disconnected, or had it done, Mr. Stanley's residence in Queen City on February 26, 1931, at 4:30 P. M. It was disconnected because I had not been able to make an agreement or settlement with him of the electric bill due (for the garage) by him. I felt some disposition should be made by him of his account. * * * He tendered me the money for his house bill and I refused to take it. I cut

him off anyway. I cut him off at his house because he wouldn't pay his shop bill. I did not connect back his house with electricity until I had to do it. The court made me do it. I would not agree to do it until the sheriff told me I had to do it." It is admitted that Mr. Stanley had fully paid and was not in arrears for electricity for his residence. The theory of exemplary damages is that of punishment and as a warning to prevent the commission of like wrongs. 13 Tex. Jur. Sec. 130, pp. 236, 237. It is the established rule that where the defendant acted intentionally or with a degree of gross negligence or upon that which would be legally classed as malice, all of which was shown to exist in the present case, which approximates a fixed purpose to bring about the injury which the plaintiff complains of, a recovery of exemplary damages may be sustained. 13 Tex. Jur. Sec. 133, p. 241; 17 C. J. Sec. 293, p. 993; 8 R. C. L. Sec. 134, p. 590."

The same case just referred to was appealed to the Supreme Court of Texas and is found in 70 S. W. 2d 413, and that Court said: "Finally, on February 26, 1931, the company, because Stanley had not paid the garage or shop account, cut the electricity off from his residence, although the amount due on the residence account was tendered. The company declined to turn the current back, and left the residence without electricity until the district court by mandatory injunction forced the company to reconnect the residence with its line. This suit followed the act of the plaintiff in error in cutting off its current from Stanley's residence, and the jury awarded both actual and exemplary damages.

"No complaint is here made as to the award of actual damages. The contention before us is that the award of exemplary damages was unjustified. We do not agree with that contention.

"We again refer to the opinion of the Court of Civil Appeals for a statement of the facts of the case. Mr.

Ramsey, the manager of the company, testified that he cut off the electricity from Stanley's residence solely because the shop account had not been paid. In part he testified:

" 'I did not inquire about Mr. Stanley, Mr. Stanley came to see me in December. Yes, the bill was there and solely for his shop. There was a different meter for the shop from the house. Yes, they were carried separately. He paid his house bill for August, September, October, November and December. Yes, he paid them in full. Yes, I told him in February that unless he paid his shop bill I would have his house cut off. I knew those were two different bills. * * * Yes, I cut the man off at his house because he would (not) pay his shop bill. * * * I also knew that he could not get electricity from any other source. I did not put him back on until I had to. Yes, the court made me do it. * * *

"It will be noticed that Mr. Ramsey candidly states the exact motive of the company in cutting off its service from Stanley's residence, when he says:

" 'I cut off his house to force him to pay the bill at the shop.'

"In view of the undisputed facts, we are in full accord with the opinion of the Court of Civil Appeals that exemplary damages were recoverable. When a public service company turns off or disconnects its service to coerce the payment of an unauthorized demand, the consumer may recover punitive damages where the circumstances justify it. McQuillin on Municipal Corporations (2d Ed.) vol. 4, Sec. 1919, p. 1023; Birmingham Water Works Co. v. Keiley, 2 Ala. App. 629, 56 So. 838; Carmichael v. Southern Bell Tel. & Tel. Co., 157 N. C. 21, 72 S. E. 619, 39 L. R. A. (N. S.) 651, 654, Ann. Cas. 1913B, 1117. * * *

"The motive which actuated the company in cutting its current from Stanley's residence was to force him to pay an account due under another contract, the ac-

curacy of which was in dispute. The action of the company, under all the circumstances, was clearly unwarranted in law, and oppressive in its effect. Its oppressive character was well understood by the company, for its manager said that its purpose was to force Stanley to pay the disputed bill. The company when it acted thoroughly understood that the cut off would deny Stanley the use of electricity at his residence, for the reason that it was the only source of electric supply in the little town where Stanley resided. To say the least of it, the conduct of the company was tortious and oppressive. Under such circumstances, as shown by the Court of Civil Appeals, exemplary damages are recoverable, even where the tortious conduct involves a breach of contract. Authorities supra; 13 Texas Jurisprudence, p. 247, Sec. 137; Scheps v. Giles (Tex. Civ. App.) 222 S. W. 348; 8 Ruling Case Law, p. 590, Sec. 134; 17 Corpus Juris, p. 983, Sec. 280.

"In the instant case, however, something more was involved than a mere breach of contract. The plaintiff in error was a public service company, and its duty to supply Stanley with electricity arose not only from its contract, but also from its public duty as well. 16 Texas Jurisprudence, p. 230, Sec. 3; 21 Texas Jurisprudence, p. 8, Sec. 6. Its tortious conduct arose not only from its refusal to comply with its contract with Stanley for an oppressive purpose, but also from its refusal to fulfill its public duty from a like purpose."

██ ██ In the recent case of Hunter v. Williams, No. 40,382, decided February 4, 1957, we cited with approval the case of Milner Hotels v. Brent, 207 Miss. 892, 43 So. 2d 654, to the effect that the elements justifying the allowance of punitive damages are (1) a wrongful act, (2) intentionally performed, (3) gross disregard of rights, and (4) wilfulness. It is apparent from the proof in this case that each and all of said elements were present and in addition thereto that appellant's con-

duct was oppressive in the extreme. In fact it is difficult to imagine a case where conduct was more oppressive than that manifested by the record before us. There was no electricity available to the appellee in this case and the appellant well knew this and simply because she had sued for her rights arising out of the wrongful cutting of her timber, the appellant wilfully and oppressively refused to connect her property with electric service. It is our conclusion that the judgment of the lower court should be affirmed.

Affirmed.

*McGehee, C. J.,* and *Kyle, Holmes* and *Gillespie,* JJ., concur.