Chrysler Corporation ("Chrysler") and Brewbaker Motors, Inc. ("Brewbaker"), appeal from a judgment entered against them on a jury verdict in favor of Ray Schiffer. We affirm conditionally.
This action began on July 26, 1994, when Schiffer filed a complaint against Chrysler and Brewbaker. The complaint alleged that while Schiffer was doing business as Auto Diesel Machine Service ("ADM"), he purchased from Chrysler and Brewbaker a "1994 Dodge pick-up truck" for $27,015.96. It alleged: (1) that Chrysler and Brewbaker, through their agents or employees, "represented" to Schiffer that the vehicle "was `new' and had never been damaged"; and (2) that Schiffer eventually discovered that the vehicle "had been damaged, repaired, and repainted prior to purchase," and that it had "sustained damage to the driveshaft and oil pan." Schiffer sought compensatory and punitive damages from Chrysler and Brewbaker based on various fraud theories. From Brewbaker, he also sought compensatory damages, including compensation for "mental anguish, anxiety, and emotional distress," under the theory of breach of contract.
A jury returned the following verdict: "We, the jury, find for the Plaintiff, Ray Schiffer, and against the Defendants, Chrysler, Inc., and Brewbaker Motors, Inc., and assess damages as follows: Compensatory $50,000; Punitive $325,000." It is undisputed that the compensatory award was based, in part, on Schiffer's demand for compensation for mental distress. Chrysler and Brewbaker filed what they called a "post-trial alternative motion for judgment as a matter of law, a new trial or remittitur." After hearings, the trial court overruled this motion. Chrysler and Brewbaker appeal.
On appeal, Chrysler and Brewbaker contend that Schiffer had no standing to maintain this action. They also contend that "the vehicle was new as a matter of law and could therefore not serve as a basis for allegations of breach of contract, fraud, or suppression." Brief of Appellants, at 14. They insist that the punitive-damages award was both unauthorized and excessive.[1]
 I. Standing
Chrysler and Brewbaker first contend that ADM is a corporation; that the vehicle was, in fact, owned by the corporation, not Schiffer individually; and, consequently, that Schiffer had no standing to maintain this action. Corollarily, they argue that the jury could not properly award damages based on mental distress. They contend, in other words, that "[a]ny claim Schiffer might have had is derivative and barred." Brief of Appellants, at 7. For these propositions, they cite General Motors Corp. v. Bell, 714 So.2d 268, 290-91 (Ala. 1996). As will be seen from a brief comparison of these cases, Bell is inapposite.
Bell involved an action against General Motors Corporation ("GM") and General Motors Acceptance Corporation ("GMAC"), commenced by Charles Bell, the sole shareholder in Charles Bell Motor Company, Inc. (the "Dealership"), individually, and by the dealership itself. Id. at 272. Bell and the Dealership "alleg[ed] that GM and GMAC had conspired to put the Dealership out of business." Id. (emphasis added). The claims of Bell and the Dealership are more specifically described as follows:
 "[T]he plaintiffs alleged that GM had violated the Motor Vehicle Franchise Act, Ala. Acts 1981, No. 81-390, codified at Ala. Code 1975, § 8-20-1 et seq. (`the Dealer Act'), by, among other things, 1) *Page 541 
refusing to compensate the dealership for warranty work at the same rates that the dealership charged its retail customers for similar non-warranty service and repairs (see § 8-20-7); and 2) coercing or attempting to coerce the dealership to accept delivery of vehicles that it had not ordered and did not want (see § 8-20-4(1)(a)). The plaintiffs further alleged that GMAC had violated the Dealer Act by, among other things, attempting to condition its approval of a request by the dealership for a loan renewal on the dealership's executing a release in favor of GM and GMAC (see § 8-20-4(3)m.). The plaintiffs also alleged that GM and GMAC had made material misrepresentations, or had suppressed material facts, all for the purpose of putting the dealership out of business. The plaintiffs alleged, in the alternative, that GM and GMAC had acted wantonly in their dealings with the dealership and that their wanton acts had caused it to go out of business."
714 So.2d at 272-73.
Bell also alleged that GM and GMAC had harmed him in his individual capacity through misrepresentation, suppression, wantonness, the tort of outrage, and intentional infliction of emotional distress. Id. at 273. Based on these claims, he sought compensation for emotional distress. Id. at 290.
A jury returned a verdict in favor of the Dealership in the amount of $23 million and in favor of Bell for emotional distress in the amount of $3 million. Id. at 273. On appeal, GM and GMAC contended "that they were each entitled to a judgment as a matter of law on Bell's individual claims for damages for emotional distress." Id. at 290. "They argue[d] that the damage or harm for which Bell sought recovery was merely incidental to his status as the sole stockholder of the dealership and, therefore, that his claims were derivative ones that had to be brought on behalf of the corporation." Id.
A plurality of this Court agreed with GM and GMAC that Bell was not entitled to the damages he sought for emotional distress. It explained that "the thrust of the complaint was that GM and GMAC had acted either intentionally (fraudulently) or wantonly to drive the dealership out of business. Thus the primary nature of the harm or damage for which Bell sought to recover . . . arose out of the alleged loss of dealership funds." Id. (emphasis added). It stated: "Any emotional distress suffered by Bell would logically have been caused by such a loss of funding and the resulting demise of the dealership." The Court concluded that "the trial court erred in submitting Bell's personal damages claims to the jury." Id.
This case differs fundamentally from Bell. Schiffer ordered the truck from Brewbaker in December 1993, pursuant to a "consumer credit contract." At the top of the document, the owner of the truck is named as "Auto Diesel and Machine Serv." According to the contract, Schiffer paid $500 down, with the remainder of the purchase price due upon delivery. Schiffer's signature appears at the bottom of the document.
This contract is probative on the issue of standing, for a number of reasons. First, nothing about Schiffer's signature suggests that he signed the contract in a representative capacity. Section § 7-3-402(b), Ala. Code 1975, controls issues involving representative signatures. Specifically, § 7-3-402(b) states:
 "(b) If a representative signs the name of the representative to an instrument and the signature is an authorized signature of the represented person, the following rules apply:
 "(1) If the form of the signature shows unambiguously that the signature is made on behalf of the represented person who is identified in the instrument, the representative is not liable on the instrument.
 "(2) Subject to subsection (c), if (i) the form of the signature does not *Page 542 
show unambiguously that the signature is made in a representative capacity or (ii) the represented person is not identified in the instrument, the representative is liable on the instrument to a holder in due course that took the instrument without notice that the representative was not intended to be liable on the instrument. With respect to any other person, the representative is liable on the instrument unless the representative proves that the original parties did not intend the representative to be liable on the instrument."
(Emphasis added.)
Consistent with these provisions, Schiffer was individually liable on the contract.[2] Although ADM had been incorporated before this case was tried, the parties never established the date of its incorporation. Indeed, the title of the business as listed in the contract, namely, "Auto Diesel and Machine Serv.," does not identify ADM as a corporation. Cf. Ala. Code 1975, § 10-2B-4.01(a) (the name of a corporation "[m]ust contain . . . the word `corporation,' or `incorporated,' or an abbreviation of one of such words"). In fact, there was no evidence that Brewbaker believed it was contracting with a corporation. All the representations of Brewbaker and Chrysler were made solely to Schiffer.
In this connection, the undisputed testimony at trial was that the truck was to be used solely by Schiffer and was to be used by him in a personal, as well as a professional, capacity. More specifically, Schiffer testified that he ordered the truck with a four-wheel-drive capacity in order that he might use it for hunting.
Moreover, Schiffer testified that when the truck arrived at the Brewbaker dealership, he experienced some difficulty in obtaining the balance of the purchase price. Consequently, Schiffer testified, he turned to Jimmy Wampler, a friend, who gave him a personal loan of $26,000 to pay Brewbaker. Wampler corroborated this account with his own trial testimony.
Schiffer's testimony was further corroborated by that of his wife, Holly Schiffer, who at the time of the trial was a shareholder in ADM and who was the person primarily in charge of the corporation's bookkeeping. She testified (1) that the $26,000 did not come from corporate funds and (2) that she did not know where Schiffer got the money he used to buy the truck. Thus, not only would Schiffer have been liable personally to Brewbaker for any breach of the "consumer credit contract," but he acknowledged that he was personally liable at the time of trial to Wampler for repayment of the $26,000 loan. The sales contract that existed, therefore, existed between Brewbaker and Schiffer.
These facts distinguish this case from Bell. Unlike the interest of the individual plaintiff in Bell, Schiffer's interest in this action is direct — not derivative. Unlike the claims in Bell, the claims in this case are not entangled with, and do not arise out of, corporate claims. They involve only an item of personalty purchased by a shareholder of a corporation. The fact that the truck was purchased, in part, for use in the shareholder's business in running the corporation does not bring this case within the rule of Bell. Schiffer also testified that he was disappointed in the condition of the truck and that he was agitated and aggravated over the dispute. We conclude, therefore, that Schiffer had standing to seek compensation for mental distress.
 II. Condition of the Vehicle
Chrysler and Brewbaker correctly state: "Schiffer's case is totally dependent upon the concept of an implied representation that the truck . . . was new. This concept had its genesis in Mathis v. Jim Skinner Ford, Inc., 361 So.2d 113 (Ala. 1978)." *Page 543 
Brief of Appellants, at 14. The concept was more recently discussed and applied in Hines v. Riverside Chevrolet-Olds, Inc., 655 So.2d 909
(Ala. 1994), overruled on other grounds, State Farm Fire Casualty Co. v. Owen, [Ms. 1961950, August 21, 1998] ___ So.2d ___ (Ala. 1998).
The controversy in Hines began when Richard and Linda Hines purchased what was then a current-model "Oldsmobile Calais from Riverside Chevrolet." Id. at 914. After several months, the Hineses discovered that upon delivery of the vehicle from the manufacturer, Riverside Chevrolet had "`buffed out' some `beaded' or rough paint on the left rear quarter panel," id. at 915, which, apparently, had been repainted at the factory. Id. at 916. They sued the manufacturer and the dealer, alleging that the defendants had "represented the [automobile] as a `new' car." Id. at 915. They "alleged that, because the left rear panel had been repainted, that representation was false." Id.
The trial court entered a summary judgment in favor of the defendants, and the Hineses appealed. Thus, one question similar to the question presented in this present case was whether the Calais was new, as a matter of law, despite the factory's repainting, or the dealer's subsequent buffing, of the left-rear quarter panel. This Court answered that question in the affirmative. Id. at 923-24.
In answering that question, this Court discussed the principles we consider applicable to this present case. It explained:
 "Whether an automobile is `new' is determined by applying the `reasonable expectation' standard first enunciated in Mathis v. Jim Skinner Ford, Inc., 361 So.2d 113 (Ala. 1978):
 "`Purchasers have a right to assume that new automobiles will perform in accordance with reasonable expectations and in accordance with implied representations inherent in marketing such products. Absent express representation, implied representations are not uncommon in the sale of new products, and reliance thereon may be shown by the totality of the circumstances and the underlying nature of the transaction itself. These concepts have long been recognized in actions based upon breach of an implied warranty and, under proper circumstances, may support a tort action for misrepresentation.'
 "361 So.2d at 115. Under Mathis, implied representations that a vehicle is `new' may arise out of the mere sale of a vehicle not previously owned, and such representations, if false, may support a claim of fraud. Dodd [v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288, 1291 (Ala. 1993)]. Thus, Mathis states a special rule of fraud, which relieves the plaintiff of the burden of establishing a specific representation made by the seller to the plaintiff that a car was `new' when it was sold and the burden of establishing the plaintiff's specific reliance on that representation. Mathis, 361 So.2d at 115.
 "The type of repair or alteration that may support a claim of fraud based on a misrepresentation that a car is `new' is a repair or alteration of such an extent and magnitude that an impartial trier of fact could reasonably infer from it either that the car had been previously sold or that it had been so damaged or altered that a reasonable person, in accordance with the reasonable consumer expectations standard, would not consider it to be a `new' product. `Except in rare circumstances, where a car has undergone repair or alteration so major that it is obviously not "new" or so minor that it . . . undisputedly is "new," the question of whether a car initially sold with repaired damage was "new" when it was sold is one of fact.' Dodd, 626 So.2d at 1292; Boulevard Chrysler-Plymouth, Inc. v. Richardson, 374 So.2d 857, 859-60 (Ala. 1979).
 "Contrary to the suggestion of the Hineses, the `reasonable expectations' rule of Mathis does not impose on sellers *Page 544 
of new vehicles a general duty in tort to sell vehicles that meet reasonable consumer expectations; rather, it imposes a duty in tort not to pass off a vehicle as `new' when it has been previously sold or has been so damaged or altered that a reasonable person would not consider it a `new' product, in accordance with reasonable consumer expectations. After reviewing the evidence in favor of the Hineses and resolving all doubts in their favor, we hold that they failed to present substantial evidence that would support an inference that the Oldsmobile Calais was not `new' when it was sold to the Hineses."
655 So.2d at 923-24 (emphasis in original).
Schiffer, of course, contends that he presented a jury question as to whether his truck was "new." We agree with this contention, because, unlike the plaintiffs in Hines, Schiffer presented evidence that the truck "had been so damaged or altered that a reasonable person, in accordance with the reasonable consumer expectations standard, would not consider it to be a `new' product." Id. at 923.
Schiffer testified: (1) that after accepting delivery of his truck, he proceeded to drive it home; (2) that on the way home so much "wind noise" came from around the door on the driver's side that he could hardly hear the radio; and (3) that during the trip home, he ran into a rainstorm and got wet because water came in around the door. He testified that upon arriving at home and inspecting the truck, he discovered a gap between the top of the driver's door and the roof of the truck large enough to "get your hand in," and several holes that had been drilled into the inside of the driver's door. Upon further examination, he said, he noticed that bolts holding the fender in place had evidently been loosened and the fender moved, and discovered that the door was "crimped" on the outside in an area roughly opposite the holes. Eventually, he said, he also discovered that the oil pan was dented and that the driveshaft was bent.
At trial, Schiffer presented the expert testimony of Jerry Dennis, who had performed various tests on the driver's door. Dennis's tests suggested that a portion of the door had been repaired, or "sanded or ground," and repainted. Dennis also testified that he found "build-up material" around the "drilled holes" that he said he believed was "factory filler material."[3]
As for the purpose of the holes, Dennis was able to say only that there appeared to be some relationship between the holes that were drilled on the inside of the door and the condition of the door on the outside. Specifically, he testified:
 "Q. [Defendants' counsel:] What was your opinion about what happened with these holes before?
 "A. [Dennis:] That was the first time I have seen anything like that. I was baffled. I've never seen anything like it.
". . . .
 "Q. Is there any evidence of the outer skin of the door being repaired?
 "A. The paint thickness profile shows that in this particular area you have got real low readings, which is indicative of somebody trying to buff up scratch marks or something that would show on the external surface of the door.
 "Q. So how is the outside and the inside connected in your opinion, or is it?
 "A. It appears that they had a problem in this particular area on the inside and the outside of the door, and it appears somebody has made an effort to fix it.
". . . .
 "A. That is what all this evidence looks like. It is not consistent with any other door on this type truck that I have seen. If you have got a thousand trucks *Page 545 
out there and all the doors are this way, then that's normal. This is not normal.
 "Q. On page 43 [of previous deposition testimony] I asked you: `Is there any reason for these holes to be there at all?' You answered: `If you have an area that gets hit like the side of the door and it is concave, they usually drill holes and put a device in there and pull it back out smooth to get it as smooth as they can. And that's usually why they drill these holes. They have got a device they can stick in those holes and it is a spreader, and they can pull it back out and get it all even. Then they usually fill these holes in and buff them off and paint them. They have made a repair that's not factory.' Is that what it says?
 "A. Yes, sir. That's correct. But they usually will just drill one hole that will suffice, and they won't have all these other little bitty holes associated with it. I have no idea what all those other little, small holes are for."
Chrysler's own ad litem inspections essentially corroborate the damage alleged in this action. Specifically, Dennis Taljan, the defendants' expert witness, testified that his tests on the door revealed that it had been repainted at the plant. Also, James Dupree, a "technical adviser" for Chrysler, found evidence (1) that the fender had been moved, (2) that the oil pan had been bent, and (3) that the driveshaft had been damaged.
Chrysler and Brewbaker offer no explanation for the damage, or for the delivery of the truck in a damaged condition. This lack of explanation apparently arises out of their litigation strategy, which appears to have been to avoid implicating one another. In that connection, they have shared the same counsel, both at trial and in this appeal. Moreover, Chrysler and Brewbaker have executed a contract whereby Chrysler agrees to indemnify Brewbaker "for any judgment or settlement reached in [this action]."
In lieu of offering alternative explanations for the damage, Chrysler and Brewbaker insist that any damage was so minor that the truck was still "new," as a matter of law, and, consequently, that they owed no duty to disclose it. They criticize Schiffer for not settling for a replacement of the door, the oil pan, and the driveshaft with parts ordered from the factory.
Similarly, they rely on a "disclaimer" paragraph in the consumer-credit contract Schiffer signed in ordering the truck. That provision states:
 "Purchaser acknowledges and understands that certain new vehicles may be received from the manufacturer or by dealer transfer with minor damage to paint, body, trim, and glasses; or in the case of a used vehicle, damage may have occurred while in the hands of a previous owner. Purchaser hereby accepts such repairs, if any, as satisfactory and waives any and all claims or causes of action against the seller and manufacturer arising out of such repairs."
(Emphasis added.)
They overlook, however, the fact that the scope of this waiver is expressly limited to "minor damage." Thus, it would cover a vehicle such as the one involved in Hines, supra, in which, despite the minor repairs, the vehicle was still "new," as a matter of law. In such a case, this provision could be relevant to a claim alleging suppression. Where, however, the damage is so considerable as to present a jury question as to whether the vehicle is "new," a provision like this one has no operation.
The damage in this case was considerable. Schiffer presented evidence suggesting that the cost to replace the door, the oil pan, and the driveshaft would exceed $1,900. But even the damage to the door alone was more extensive than the damage to the quarter panel in Hines. Here, the very integrity of the door was compromised by the numerous holes drilled into it. *Page 546 
The damage to Schiffer's truck was not "so major that it is obviously not `new' or so minor that it . . . undisputedly is "new." 655 So.2d at 923 (emphasis in original). The question whether his truck was "new" was one to be resolved by a jury. Id. Thus, it was not within the scope of the waiver provision. The trial court properly denied the defendants' motions for a judgment as a matter of law.
 III. Punitive Damages
Chrysler and Brewbaker contend that the punitive-damages award was prohibited by Ala. Code 1975, § 6-11-20, and, in the alternative, that the award was excessive. We shall address these arguments separately.
 A. Section 6-11-20
Section 6-11-20 provides in pertinent part: "(a) Punitive damages may not be awarded in any civil action, . . . other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Chrysler and Brewbaker argue that Schiffer did not present clear and convincing evidence that they "consciously or deliberately engaged in . . . fraud" in the sale of his truck. We disagree with this argument.
Virtually every factual aspect of this case was contested. Schiffer's theory of the case was that the damage occurred at the factory and that Brewbaker, which he says knew, or should have known, about the damage, breached its duty to disclose the facts to Schiffer. Schiffer presented a document entitled "Chrysler Transportation Vehicle Inspections Claims System Inspection Detail" ("Inspection Detail"). The Inspection Detail purports to show the results of an inspection performed on Schiffer's vehicle immediately before it left the Chrysler assembly plant. It indicates, among other things, (1) that the left door was "chipped"; (2) that the left-front fender was "scratched"; and (3) that the left quarter panel was "dented." Schiffer argued that the damage on the Inspection Detail "corresponded with the real damage to [his] truck." Brief of Appellee, at 20.
Schiffer also elicited testimony from Ronald Czar, "manufacturing manager" at the "Warren Truck Assembly Plant" in Warren, Michigan, where his truck was assembled. On cross-examination, Czar stated that Chrysler routinely generated documents, other than the Inspection Detail, that, in this case, would have shown any damage that had occurred at the factory. He first testified that those documents are normally destroyed after "about a year." However, Schiffer's counsel showed Czar a copy of a "Plaintiff's Request for Production of Documents," demonstrating that within five months after the truck was shipped from the factory, Schiffer had sought "all documents which reflect repairs, repainting, undercarriage work, or otherwise indicate that [the] Dodge pickup truck . . . was damaged and repaired." When Czar was asked why the documents had not been produced, he retreated from his previous testimony as to the customary destruction date of such documents.
Considering this evidence, in conjunction with evidence discussed elsewhere in this opinion, the jury reasonably could have concluded that Chrysler (1) substantially damaged the truck; (2) made a haphazard attempt to repair it; (3) shipped the truck for delivery to Schiffer as a "new" truck; and (4) destroyed, or refused to produce, the documentary evidence of those facts. Such a scenario satisfies § 6-11-20(a). It demonstrates clearly and convincingly that Chrysler "consciously or deliberately engaged in . . . fraud." The fact that the jury awarded punitive damages indicates the jury made those factual conclusions. That another jury might have constructed a different scenario from this evidence is immaterial. As long as the jury's view of the evidence is reasonable and is supported by the evidence, this Court is bound to accept it. Intercontinental Life Ins. Co. v. Lindblom,598 So.2d 886 (Ala.), *Page 547 
cert. denied, 506 U.S. 869 (1992). The evidence would support the factual conclusions necessary for an award of punitive damages.
Similarly, Brewbaker had in place no procedure calculated to uncover Chrysler's conduct or prevent the harm that was likely to flow from that conduct to Schiffer. In this connection, Craig Lyne, service manager for Brewbaker, testified as follows:
 "Q. [Schiffer's counsel:] So, really, from the time that the [truck] — that Mr. Schiffer's [truck] came in, assuming that damage was there for the purposes of this question, from the time it came in until the time it was sold, if that damage was there — I mean, that damage could have been there just because nobody really inspected that area, did they?
". . . .
"A. [Lyne:] Yes, sir.
 "Q. So, it's possible, is it not, that the damage was in existence at the time it was sold to Mr. Schiffer?
". . . .
"A. Yes, sir.
"Q. It's possible, isn't it?
"A. Yes, sir.
 "Q. And y'all didn't have any policies and procedure or inspection out there that would have uncovered that area of damage, would you?
". . . .
"A. Not that I'm aware of, no, sir.
 "Q. That's not the way it's done, is it, the inspections?
"A. No, sir."
A dealership may not close its eyes to factory damage and avoid joint liability with the manufacturer under "the special rule of fraud" recognized in Mathis v. Jim Skinner Ford, Inc.,361 So.2d 113 (Ala. 1978). Hines v. Riverside Chevrolet-Olds, Inc.,655 So.2d 909, 923 (Ala. 1994), overruled on other grounds, State Farm Fire Casualty Co. v. Owen, [Ms. 1961950, August 21, 1998] ___ So.2d ___ (Ala. 1998). Compare Hargrove v. Cantrell, 547 So.2d 488, 491 (Ala. 1989), an odometer-rollback case, where we said: "A dealer may not close his eyes to the truth. Although [the dealer] may not have known to a certainty that [the] plaintiff would be defrauded, this Court may infer that [the dealer] understood the risk of such an occurrence." We conclude that Brewbaker was jointly liable with Chrysler for misrepresenting the condition of the truck.
 B. Excessiveness
The question whether the $325,000 punitive-damages award was excessive must be resolved by applying the factors set forth in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), with due regard for BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996). In Green Oil, we said:
 "The following could be taken into consideration by the trial court in determining whether the jury award of punitive damages is excessive or inadequate:
 "`(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
 "`(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or `cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
 "`(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss. *Page 548 
 "`(4) The financial position of the defendant would be relevant.
 "`(5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.
 "`(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
 "`(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.'"
539 So.2d at 223-24. In applying these factors to the facts of this case, we conclude that the punitive-damages award was excessive.
To be sure, to sell a substantially damaged vehicle as new is reprehensible. Moreover, assuming the jury found what the evidence would have permitted it to find, we have a finding that Chrysler damaged the truck and attempted to conceal its actions by denying responsibility and destroying inculpatory documentary evidence. Indeed, under this scenario, it matters little whether the documents were destroyed prematurely, that is, before the customary destruction date.
In this respect, Chrysler's conduct was more reprehensible than the conduct involved in BMW of North America, Inc. v. Gore,701 So.2d 507 (Ala. 1997), in which we conditionally affirmed a judgment awarding punitive damages against BMW, subject to a remittitur of the punitive-damages award to $50,000. That judgment was based on BMW's failure to apprise the plaintiff that his new automobile had been repainted after incurring damage from acid rain. Id. at 508. At the time of the conduct in Gore, several states had enacted statutes establishing thresholds for requiring disclosure of repairs. Gore, 517 U.S. at 577-78. BMW might have construed these statutes as evidence of a general zone of safety, or "safe harbor," and that its conduct was within this zone. See id. ("the record contains no evidence that BMW's decision to follow a disclosure policy that coincided with the strictest extant state statute was sufficiently reprehensible to justify a $2 million award of punitive damages").
Chrysler's conduct falls within no such safe harbor. Effective at the time this cause of action arose was Ala. Code 1975, 8-19-5(22), which prohibits "selling a new motor vehicle, [and] failing to disclose material damage to the motor vehicle." (Emphasis added.) Section 8-19-5(22)c. defines "material damage" as "damage sustained or incurred by a motor vehicle, whether corrected or uncorrected, which cost to repair exceeds three percent of the manufacturer's suggested retail price of the vehicle based upon the dealer's retail repair cost or the sum of $500, whichever is greater."
It is undisputed that the cost to repair the damage to this truck exceeded $500. In fact, Craig Lyne testified that the cost to replace the door would exceed $500. Thus, we find nothing on which Chrysler might have relied in good faith, such as the statutes on which BMW arguably might have relied. It is also true, of course, that there have been no civil or criminal penalties imposed upon the defendants for this conduct.
However, the actual or potential harm caused by these defendants is fundamentally economic in nature. See Gore,517 U.S. at 576 (conduct causing "purely economic" loss may warrant less punishment than conduct that threatens safety of the consumer). The defects in Schiffer's truck were not safety-related. This is true even of the bent driveshaft, which, indeed, caused some vibration, but did not affect the truck's safety.
Similarly, selling new automobiles carries less potential for economic harm than, for example, selling insurance. See Life Ins. Co. of Georgia v. Johnson, 701 So.2d 524 (Ala. 1997) (the sale of useless *Page 549 
insurance to an unsophisticated, 84-year-old insured justified an award of $3 million in punitive damages). Purchasers of new automobiles are likely, as was Schiffer, to be relatively more sophisticated and less vulnerable than purchasers of many other types of products or services.
Also, "material" damage is generally relatively easy to detect. Thus, it is difficult to understand how the kind of conduct involved in this case could be pervasive in Chrysler's operations and, therefore, particularly profitable to Chrysler. This factor, therefore, also weighs in favor of a reduction in the punitive-damages award.
In conclusion, our own Green Oil analysis leads us to conclude that the punitive-damages award in this case may not exceed $150,000. Consequently, the judgment of the trial court is affirmed on the condition that Schiffer file with this Court within 21 days a remittitur of punitive damages in the amount of $175,000 (leaving a total judgment of $200,000). Otherwise, the judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.
Hooper, C.J., and Kennedy, J., concur.
Lyons, J., concurs in the result as to Part I and concurs as to Parts II and III.
Maddox, Houston, See, and Brown, JJ., concur in the result.
[1] They do not specifically challenge the amount of the compensatory-damages award. In other words, they contend that any compensatory award was unauthorized by the facts, not that the amount awarded was excessive.
[2] Schiffer testified that he listed ADM as the owner of the truck only upon the suggestion of a Brewbaker salesman and that he did so in order to qualify for a "fleet discount."
[3] Dennis Taljan, the defendants' expert witness, testified that he found no evidence of factory filler around the holes.