878 So.2d 1120 (2003)
SOUTHERN PINE ELECTRIC COOPERATIVE
v.
Christopher BURCH.
1020066.
Supreme Court of Alabama.
March 28, 2003.
Opinion on Return from Remand October 24, 2003.
*1121 W. Austin Mulherin III and Mary Margaret Bailey of Frazer, Greene, Upchurch & Baker, L.L.C., Mobile, for appellant.
Max Cassady of Cassady & Cassady, P.C., Evergreen, for appellee.
WOODALL, Justice.
Christopher Burch sued Southern Pine Electric Cooperative alleging wrongful termination of his electric service. A jury awarded Burch $20,000 in compensatory *1122 damages and $75,000 in punitive damages. Southern Pine Electric Cooperative filed a motion for a remittitur, which the trial court orally denied, without stating its reasons for doing so. Southern Pine Electric Cooperative appealed.
The trial court erred in denying Southern Pine Electric Cooperative's motion for a remittitur without providing a written statement of the reasons for the denial. We remand this case for the trial court to enter an order in compliance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), stating its reasons supporting the denial of the motion. See Love v. Johnson, 775 So.2d 127 (Ala.2000); see also Spencer v. Lawson, 815 So.2d 502 (Ala.2001); Guaranty Pest Control, Inc. v. Bush, 851 So.2d 548 (Ala.Civ.App.2002). The trial court is instructed to file a return to this Court within 56 days of the release of this opinion, after which Southern Pine Electric Cooperative will have 14 days to file a supplemental brief, if it chooses to do so. Burch will then have seven days to respond, and Southern Pine Electric Cooperative may file a reply brief within seven days of Burch's response.
REMANDED WITH DIRECTIONS.
MOORE, C.J., and HOUSTON, LYONS, and JOHNSTONE, JJ., concur.

On Return From Remand
WOODALL, Justice.
On March 28, 2003, we remanded this case for the trial court to enter an order in compliance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), stating its reasons for denying the motion of the appellant, Southern Pine Electric Cooperative ("Southern Pine"), for a remittitur of a compensatory-damages award of $20,000 and a punitive-damages award of $75,000 in favor of Christopher Burch, without providing a statement of its reasons for the denial. Southern Pine Elec. Coop. v. Burch, 878 So.2d 1120, 1122 (Ala.2003). Following a hearing on remand, the trial court, in a written order, again denied Southern Pine's motion. We now address the merits of Southern Pine's appeal.
Southern Pine is a "[c]ooperative, nonprofit membership corporation[]," as defined by Ala.Code 1975, § 37-6-2, "organized under [Ala.Code 1975, §§ 37-6-1 to -49,] for the purpose of supplying electric energy and promoting and extending the use thereof." This action arose out of an attempt by Southern Pine to collect payment for electrical service it provided to Tracy Burch, who, at some time, was married to Brian Burch, the cousin of the plaintiff, Christopher Burch. That service was provided to a mobile home located on County Road 27 in Castleberry. Southern Pine terminated electrical service at the site in April or May 2001, after it was unable to collect $677.31 on Tracy Burch's past-due account.
On May 7, 2001, Christopher Burch submitted an "Application for Membership and Electrical Service," seeking to reestablish electrical service at the mobile home. Southern Pine approved the application and dispatched district supervisor James Brown and service technician Chet Dolihite to the site to reestablish electrical service. Brown and Dolihite completed their assignment and were leaving the premises, when, they say, they met an automobile, with a male driver and a blonde female passenger, driving toward the mobile home. According to Brown and Dolihite, the vehicle was a white Mercury automobile that had customarily been parked at the mobile home while the account for electrical service to the mobile home was in Tracy Burch's name.
Subsequently, Brown reviewed the account file of Christopher Burch, which contained *1123 a copy of Christopher's driver's license. From the photograph on the copy, Brown concluded that Christopher Burch was the driver of the white Mercury. He further concluded that he had seen Christopher at the mobile home on an earlier occasion, while the account was in Tracy's name, and that, on that occasion, Christopher had identified himself to Brown as Tracy Burch. Brown also believed that the blonde woman in the Mercury was someone he had seen in and around the mobile home while the account was in Tracy Burch's name.
Southern Pine concluded that Christopher's membership application was merely an attempt to circumvent the past-due account, for which service to the mobile home had been discontinued. It concluded, in other words, that "Southern Pine was dealing with the not-uncommon problem of members attempting to avoid indebtedness for electrical service by simply changing the name on the account from one resident of the household to another." Brief of Southern Pine, at 7. Therefore, the first electrical bill mailed to Christopher was for $737.39. Of that amount, $60.08 was designated as "current bill," while $677.31, the amount due on Tracy Burch's delinquent account, was designated as "previous balance." On June 15, 2001, Christopher paid the "current bill" amount of $60.08. On June 27, 2001, Southern Pine discontinued electrical service to Christopher for failure to pay the alleged delinquency. The termination occurred while Burch was away from home, resulting in the spoilage of refrigerated perishables worth approximately $100.
On July 13, 2001, Christopher sued Southern Pine, alleging (1) breach of contract, (2) "wrongful termination of electrical power," and (3) "wanton or willful termination of electrical service." Electricity was restored to the mobile home on July 31, 2001, pursuant to a court order; Southern Pine offered no opposition. Subsequently, Southern Pine counterclaimed against Christopher for the delinquent amount on Tracy's account.
After the complaint was filed, Southern Pine's personnel began surveilling Christopher's premises from County Road 27, approximately 200 feet from the mobile home. While doing so, James Brown took a number of photographs of a blonde woman on the premises.
A jury trial began on June 24, 2002. At the close of all the evidence, Southern Pine moved for a judgment as a matter of law ("JML") on all the claims. The trial court granted the motion only as to any claims sounding in negligence. It also granted Burch's motion for a JML on the counterclaim. The case was submitted to the jury on claims of breach of contract and wantonness. The jury awarded Burch $20,000 in compensatory damages and $75,000 in punitive damages.
Southern Pine filed a posttrial motion for JML, as well as a motion for a remittitur or, in the alternative, a new trial. Those motions were denied, and Southern Pine appealed. On appeal, Southern Pine contends (1) that the trial court erred in granting Burch's motion for a JML on the counterclaim; (2) that evidence of mental distress, which formed the primary basis for the compensatory-damages award, was insufficient to support the award; and (3) that the punitive-damages award was excessive.

I. Counterclaim
The theory of Southern Pine's counterclaim against Christopher was (1) that Tracy Burch continued to live at the mobile home after electrical service was reestablished in Christopher's name on May 7, 2001, or (2) that Christopher had lived at the mobile home before May 7, 2001. In either case, Southern Pine argued, it was *1124 entitled to terminate Christopher's electrical service and to collect from Christopher the amount Tracy owed Southern Pine. As support for its theory, Southern Pine relied on Ala.Code 1975, § 37-6-30(b), which provides:
"(b) Any rural electric cooperative or gas district may terminate or decline service at all locations if an applicant or customer, or a member of the applicant's or customer's household, is indebted to the rural electric cooperative or gas district for services at the present location or a former location of the applicant or customer. This section shall not apply if a person was not a member of the household of the applicant or customer, or if a person was a minor when the indebtedness was incurred. In the event that such indebtedness for service previously rendered is in dispute, the applicant shall be served or the customer's service shall be continued upon complying with the normal deposit requirements of the rural electric cooperative or gas district and, in addition thereto, by making a special deposit in an amount equal to the net balance in dispute. Upon settlement of the disputed account, the balance, if any, due the applicant or customer or member of applicant's or customer's household shall be promptly repaid."
(Emphasis added.)
Southern Pine argues:
"Rather than [entering a judgment as a matter of law,] the trial judge should have left it for the jury to decide whether Southern Pine had proved that it had sufficient reason to believe either that Plaintiff had been a resident prior to his application or that Tracy Burch had continued to be a resident after his application. The trial court's dismissal of the counterclaim was unduly prejudicial to Southern Pine as it implied to the jury that the trial judge had sanctioned Plaintiff's argument [that neither of those scenarios was true], leaving to the jury only the determination of damages."
Brief of Southern Pine, at 48 (emphasis added). We disagree with Southern Pine's argument.
The success of the counterclaim did not depend on whether Southern Pine had "reason to believe" that Christopher and Tracy were members of the same household, that is, that they were attempting to avoid Tracy's indebtedness to Southern Pine by simply changing the name on the account. The success of the counterclaim depends on whether § 37-6-30(b) authorizes an action against one household member for the debt of another household member. The trial court raised this issue sua sponte during Burch's case-in-chief.
During Southern Pine's cross-examination of Garrey Cave, Southern Pine's office manager,[1] counsel for Southern Pine attempted to elicit testimony as to the source of Southern Pine's alleged right to "transfer the indebtedness" of Tracy Burch to Christopher Burch. The following colloquy occurred:
"Q. [By counsel for Southern Pine:] Now, will you please tell the jury why Southern Pine transferred that $677 from Tracy Burch's account to Christopher Burch's account?
"A. [By Cave:] On the recommendation of Mr. [James] Brown, the service manager, or the district manager, of the Evergreen office. He told us that we needed to transfer it because the same people were living in the account as were living in the account before it was put in Christopher's name.

*1125 "Q. In other words, that Tracy Burch had been living in there prior to May 7 and was continuing to live in there after May 7?
"A. Right.
"Q. And the same thing with Christopher Burch?
"A. That's correct.
"Q. And under either scenario, could Southern Pine transfer the indebtedness?
"[By Burch's counsel:] Object to the  that's 
"[The Court:] Sustained.
"Q. [Southern Pine's counsel:] I think you've already explained to us why, though, you transferred it.
"A. Right.
"Q. Will you please tell the jury what right, if any, Southern Pine had to transfer the indebtedness from the account of Tracy Burch to the account of Christopher Burch?
"[Burch's counsel:] Same objection.
"[By Southern Pine's counsel:] `What right'? I mean, certainly they must have thought they had a right to do it, and I just want him to be able to tell the jury why they felt like they had this right to do it.
"[The Court:] I would like  this really brings up a point I would like to discuss with counsel outside the presence of the jury."
Outside the presence of the jury, the trial judge suggested that he would grant a motion for a JML on the counterclaim, based on the absence of statutory authority for the counterclaim. In that connection, the following colloquy occurred:
"[The Court:] The problem with this line of question[ing] is: I don't know why you say you can transfer any debt at all. Where is that? Where is the law on that? Show me where it says you can transfer [the debt].
"....
"[Southern Pine's counsel:] That we can terminate 
"[The Court:] No. No. We are not talking about termination, because we have not been talking about termination lately. We've been talking about transferring a debt. Show me where it says you can transfer a debt.
"[Southern Pine's counsel:] It does not say specifically, `transfer.' It just says that they can terminate the power 
"[The Court:] Exactly.

"....
"... If I'm sitting here, and I'm living with my roommate... at a college residence, and Southern Pine happens to furnish me power .... and my roommate has an electric bill in his name, and he doesn't pay it, can you sue me for that electric bill and collect? I'm living there. I'm using electricity the whole time.
"[Southern Pine's counsel:] Not, Your Honor, until, or unless, you go out and put an account in your own name, then we can.
"[The Court:] You can sue me?

"[Southern Pine's counsel:] That's our position.
"[The Court:] Where? Where do you find that in the law?
"[Southern Pine's counsel:] Well, it says that  well, we can terminate your 
"[The Court:] Exactly. You can decide not to furnish me electricity, but it does not ever say anywhere in that [statute]  and I was just wondering where this is coming from  that you can sue me for a debt that somebody else owes.

*1126 "Unless I have agreed to pay [for] that electricity, you can't sue me. I may have used it, but ... you could sue anybody that went into somebody's house and drank a little bit of water 
"....
"What I'm saying is: I'm about ready to  unless you show me some good law that says I shouldn't  dismiss your counterclaim, because you haven't got a leg to stand on. And when you're talking about all this transferring a debt around, I don't think you can do that, because I don't see any authority to do it.
"....
"... [T]he law doesn't give you the right to sue somebody for a debt unless they agree to pay it. And [Christopher] never agreed to pay it, so that's why I sustained the objection. [Christopher Burch's counsel] may have had a different idea for his objection, but I wanted to make it clear why I was sustaining the objection.
"[Burch's counsel:] I just thought it was an ultimate issue.
"[The Court:] Well, I just don't think there is an ultimate issue on that issue, because I don't think it exists. I don't think the statute gives him the right to transfer the debt around. It gives him the right to terminate, and it gives him a right to demand a deposit if there's a dispute about how much is owed. But I don't think it gives [Southern Pine] a right to sue the new guy for that debt.
"....
"It doesn't give [Southern Pine] the right to sue [Christopher Burch] to get the $677. You have the right to demand $677 from him before you provide service if you can prove that he was a member of the household that skipped out on the bill.
"....
"[Southern Pine's counsel:] But how do we get our money?
"[The Court:] You find Tracy Burch, and you sue her."
(Emphasis added.)
We agree with the trial court's interpretation of § 37-6-30(b). By its plain meaning, the statute merely authorizes a "rural electrical cooperative" to "terminate or decline service" to an "applicant or customer," if such person or "a member of the applicant's or customer's household, is indebted to the rural electrical cooperative." (Emphasis added.) Nothing in the statute authorizes a rural electrical cooperative to sue one member of a household for a debt incurred by another member of the household. That is precisely the purpose of Southern Pine's counterclaim. Because there was no legal basis for the counterclaim, the trial court did not err in entering a JML on the counterclaim.

II. Damages for Mental Distress
Southern Pine contends that it is entitled to a substantial remittitur of the $20,000 compensatory-damages award. Burch proved only $100 in economic loss; therefore, Southern Pine insists, the balance of the award, that is, $19,900, represented damages for mental distress. It argues that Burch "failed to testify in significant detail about the nature, severity, or duration of his alleged [mental distress]." Brief of Southern Pine, at 16. We address these contentions in the context of a claim alleging the wrongful termination of utilities and the standard of review of a damages award for mental distress.

A. Basis of the Claim
*1127 "A public utility[[2]] is obligated to serve all members of the public that it holds itself out to serve, fairly and without discrimination." Miller v. Hillview Water Works Project, Inc., 273 Ala. 267, 271, 139 So.2d 337, 339 (1962). "This duty ... exists independent of [a] statute regulating the manner in which such utilities do business.... The duty is imposed because [public utilities] are organized to do a business affected with a public interest and are held out to the public as being willing to serve all of its members." 273 Ala. at 271, 139 So.2d at 340. A breach of such public duty "is a tort, wherein the measure of damages is governed by the rules of tort actions." Alabama Water Serv. Co. v. Wakefield, 231 Ala. 112, 115, 163 So. 626, 628 (1935). Thus, in actions alleging the wrongful termination of utility services, damages for mental distress are recoverable, 231 Ala. at 116, 163 So. at 628, "and, when the circumstances justify it, [so are] punitive damages." Sims v. Alabama Water Co., 205 Ala. 378, 380, 87 So. 688, 690 (1920); Birmingham Waterworks Co. v. Keiley, 2 Ala.App. 629, 56 So. 838 (1911).

B. Standard of Review
"There is no fixed standard for determining the amount of compensatory damages a jury may award for mental anguish. The amount of the damages award is left to the jury's sound discretion, subject only to review by the court for a clear abuse of that discretion." Delchamps, Inc. v. Bryant, 738 So.2d 824, 837 (Ala.1999). However, where the plaintiff suffers no physical injury and "offer[s] little or no direct evidence concerning the mental suffering sustained as a result of the defendant's wrongdoing," we give stricter scrutiny to an award for mental distress. National Ins. Ass'n v. Sockwell, 829 So.2d 111, 133 (Ala.2002). See Kmart Corp. v. Kyles, 723 So.2d 572 (Ala.1998). The plaintiff's testimony is direct evidence of mental anguish. 723 So.2d at 578. Thus, where the plaintiff has suffered no physical injury, we "address the strength of the presumption that a jury's verdict is correct," Bryant, 738 So.2d at 837, in the context of the plaintiff's testimony regarding the "nature, severity, and duration of the mental anguish." Alabama Power Co. v. Murray, 751 So.2d 494, 501 (Ala.1999). Cf. Orkin Exterminating Co. v. Jeter, 832 So.2d 25 (Ala.2001) (remitting $400,000 compensatory-damages award to $300,000); Oliver v. Towns, 770 So.2d 1059 (Ala.2000) ($500,000 compensatory-damages award remitted to $75,000); Alabama Power Co. v. Murray, supra ($150,000 compensatory-damages award reduced to $84,000); Bryant, supra (reducing $400,000 compensatory-damages award to $100,000); Kyles, supra ($100,000 compensatory-damages award remitted to $15,000).
Nevertheless, in Oliver v. Towns, supra, we held that an award of $75,000 was warranted, where the plaintiff, "who had been defrauded by her attorney, testified only that she suffered `a lot of [mental anguish]' and that she had to seek counseling because of her worry over losing the opportunity to buy a house." Jeter, 832 So.2d at 37 (discussing Oliver). In Murray, supra, where the plaintiff's home and possessions were destroyed by fire, we held that an award of $84,000 was proper, although the plaintiff testified only that "he was `all shook up,'" and that "`[i]t just was hard.'" 751 So.2d at 500. Kyles, supra, was a malicious-prosecution case in *1128 which the plaintiff was detained by law-enforcement officers for approximately three hours on a shoplifting charge. In that case, we held that an award of $15,000 was warranted, although "the only evidence presented of the plaintiff's alleged mental suffering was her husband's testimony that she had cried on one occasion." Jeter, 832 So.2d at 37 (discussing Kyles).
Burch was without electricity for 34 days. For two weeks of that time, he slept at the home of relatives.[3] He testified that he was "inconvenienced," that he "lost the use of his home," and that he was "embarrassed" at having to "move back in with [his] relatives when [his] power was off."
The direct evidence of mental distress in this case is more significant than it was in Kyles, which supported damages of $15,000. Burch testified that he was "inconvenienced" and "embarrassed"; the plaintiff in Kyles did not testify regarding her mental state. Also, the deprivation in this case lasted for weeks, while in Kyles the plaintiff was detained approximately three hours. We conclude, therefore, that an award of $19,900 for mental distress is not excessive. See also Alabama Power Co. v. Harmon, 483 So.2d 386 (Ala.1986) (award of $75,000 for mental distress was appropriate in an action based on a 10-month delay in providing promised electrical service).

III. Punitive Damages
Southern Pine contends that the $75,000 punitive-damages award was excessive. It insists, among other things, that there is "no reasonable relationship between compensatory and punitive damages." Brief of Southern Pine, at 27.
The ratio of punitive damages to compensatory damages in this case is 3.75:1. That ratio is not a "significant deviation[]," Chrysler Corp. v. Schiffer, 736 So.2d 538, 550 (Ala.1999) (Houston, J., concurring in the result), from the 3:1 benchmark ratio discussed with approval in special writings of the Justices of this Court in various cases. See Jeter, 832 So.2d at 43 (Houston, J., concurring specially); Prudential Ballard Realty Co. v. Weatherly, 792 So.2d 1045, 1056 (Ala.2000) (See, J., concurring in part and dissenting in part); Life Ins. Co. of Georgia v. Johnson, 701 So.2d 524, 539 (Ala.1997) (See, J., concurring in part and dissenting in part). A ratio of 3:1 is "presumptively reasonable," Weatherly, 792 So.2d at 1052 (Houston, J., concurring specially), and weighs against a remittitur, absent special justification. "Only in the most extraordinary situations would the award be deemed excessive when [the punitive-damages award] is at or below the benchmark." Id. at 1053 (Houston, J., concurring specially).
As stated by the United States Supreme Court, "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW of North America, Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)(footnote omitted). Similarly, Ala.Code 1975, § 6-11-20(a), provides: "Punitive damages may not be awarded in any civil action, except ... where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Wantonness is defined as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." Ala.Code 1975, § 6-11-20(b)(3). Reprehensibility may also be a function of the "`duration of [the] conduct,'" and "`the degree of the defendant's *1129 awareness of any hazard which his conduct has caused or is likely to cause.'" Green Oil Co. v. Hornsby, 539 So.2d 218, 223 (Ala.1989) (quoting Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050, 1062 (Ala.1987) (Houston, J., concurring specially)).
Southern Pine argues that Burch has presented "no evidence of reprehensibility." Brief of Southern Pine, at 25. Burch, however, argues that the reprehensibility of Southern Pine's conduct is "extremely high." Brief of Burch, at 43. Thus, resolution of this issue turns on whether a reasonable jury could have agreed with Burch's characterization of Southern Pine's conduct.
At the outset, we note that it is undisputed that Southern Pine terminated Burch's electrical service largely on the assumption that the blonde woman its personnel allegedly observed at the mobile home on various occasions after May 7, 2001, was Tracy Burch. Thus, Southern Pine's right to terminate Burch's electrical service turned on the identity of Tracy Burch. In that connection, James Brown testified:
"Q. [By Burch's counsel:] Mr. Brown, you don't know who [the blonde woman] is; right?
"A. [By Brown:] No, sir. I do not.
"....
"Q. Well, you would agree with me that if this is not Tracy Burch that you've been seeing, y'all have made one big mistake, haven't you?
"A. If it's not, yes, sir."
Yet, remarkably, Tracy Burch was never identified for the record. For all that appears, she never entered the courtroom. In fact, Southern Pine's personnel testified that they could not identify Tracy and that they would not have recognized her had she come to court. No photograph of her was ever produced. This was so even though James Brown testified that he thought Southern Pine had a copy of Tracy's driver's license in its file on her account.
Finding this aspect of the case peculiar, the trial judge stated:
"[The Court:] One thing I am surprised at is why Ms. Burch, who apparently lives down in Castleberry, Alabama, hasn't sat up on this stand and let the jury see what she looks like. Apparently, neither one of you wants anybody to see her. What I don't understand is why somebody hasn't gone down to Ms. Burch's house and knocked on the door and said: `Are you Tracy Burch? Well, I just wanted to meet you.' And another thing I didn't understand is why somebody hadn't issued a subpoena to her to appear at a deposition that had a corporate representative show up.
"[By Burch's counsel:] That's our point. If they knew where she lived, they would have done it.
"[The Court:] Okay. Well, we now know where she lives because we heard about it right now, today. This is a small county. I can't believe we couldn't find out where somebody lived if we wanted to find out where they lived. You know what I'm saying?
"Okay. Well, I guess that's all I need to say."
(Emphasis added.)
It is undisputed that none of Southern Pine's personnel ever asked the woman they allegedly saw on the premises to identify herself. Neither did it ask Christopher whether Tracy was still living on the premises, before it assessed the past-due balance on her account against his account, or before it terminated his electrical service for the failure to pay the past-due balance. Nor did Southern Pine mention to Christopher before terminating his service *1130 its suspicions that he had resided in the mobile home on County Road 27 before May 7, 2001.
It is further undisputed that Southern Pine conducted regular surveillance of Burch's property and took a number of photographs of an unidentified woman it saw there. Indeed, on at least one occasion, Brown peered into the window of the mobile home with a telephoto camera lens to view the woman.
In addition to this undisputed evidence, Christopher's testimony contradicted much of Southern Pine's version of events. For example, he identified a woman who occasionally appeared on his property after May 7, 2001, as Jessica Murdock. He testified that, on May 7, 2001, the white Mercury automobile, which Brown and Dolihite allege they saw on County Road 27 occupied by Burch and a blonde female, was actually in Pensacola, Florida, and, therefore, was not being driven by Burch. He also denied that he had ever identified himself to Brown as Tracy Burch. He testified that he had not lived at the mobile home before May 7, 2001, and that Tracy did not live there after that date.
Burch testified that he was aware that Southern Pine was "spying" on him and that he found it offensive. He stated: "They ride by every evening. You can just about set a clock by them.... They just ride [by] in the evening ever since this case has been going on."
If the jury believed Burch, and disbelieved Southern Pine  as it apparently did  it could have found the evidence that Southern Pine terminated Burch's electrical service in "reckless or conscious disregard of [his] rights," Ala.Code 1975, § 6-11-20(b)(3), clear and convincing. On the basis of all the testimony presented, it could have found that Southern Pine's conduct was based on mere unfounded suspicion that it was operating within statutory authority. Indeed, it could have found that Southern Pine never made a reasonable effort to identify the woman it alleged was Tracy Burch. Also, based on Burch's testimony, the jury could have found that Southern Pine terminated Burch's service before it made any effort to determine whether he had lived on the premises before May 7, 2001.
From these findings, the jury could have concluded that Southern Pine conducted an ongoing campaign of surveillance of Burch's property  which included peeping into windows  solely for improper purposes, such as harassment or intimidation. Logically, the surveillance of any woman on the premises was useless as a means to identify Tracy Burch in the absence of actual knowledge of what Tracy Burch looked like.
That another jury might have made different findings and formed different conclusions is of no consequence to the issue before us, so long as this jury's verdict is supported by the evidence. Intercontinental Life Ins. Co. v. Lindblom, 598 So.2d 886, 889 (Ala.1992). This record supports these findings.
In the Hammond hearing on remand, the trial judge stated:
"[I]n view of the testimony that ... Southern Pine ... tried to prove that someone else was living in the household and then coerc[e] them to pay a bill that an old customer who was not actually related to that person owed  I see that there was reprehensible conduct in view of the fact that electric service is so necessary to our current way of life.
"... I thought that the jury did make a reasonable decision about exactly what was appropriate in this case. I was surprised that [the verdict] was as light as it was[; e]specially in view of the fact that Southern Pine cut off this man's *1131 electric service without any real proof, even under their criteria, that he fit into the category of persons where they felt like electric service should be cut off. The shoddy investigation, I think, had a lot to do with the punitive damages award, the fact they didn't really try to establish  that they just assumed a number of things about some mystery woman who was living in the trailer."
(Emphasis added.)
Moreover, counsel for Southern Pine stated in the Hammond hearing:
"Your Honor, I did not submit any affidavits or do not have any live testimony to offer with respect to any of the elements ... outlined in Green Oil and Hammond because I think it was sufficiently covered in the trial except for ... the defendant's financial position. And, Your Honor, we would concede that ... that would not be a consideration that would benefit Southern Pine in this case.... We cannot come in here and in any way stand before you and say that this verdict is going to unduly sting or cause a shutdown."
(Emphasis added.)
In view of the complete absence of a reasonable pretermination inquiry by Southern Pine into the status of the household, and in light of its conduct after it terminated Christopher Burch's service,[4] Southern Pine's arguments for a remittitur of the punitive-damages award are unpersuasive. In other words, Southern Pine has presented no reason for a reversal of the judgment or a remittitur of the punitive damages awarded. In addition, punitive damages are subject to de novo review on appeal. Acceptance Ins. Co. v. Brown, 832 So.2d 1 (Ala.2001); see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). We have conducted our own review of the punitive-damages award, considering all of Southern Pine's arguments, and we conclude that the award is not excessive. The judgment of the trial court is, therefore, affirmed.
AFFIRMED.
HOUSTON, LYONS, BROWN, JOHNSTONE, HARWOOD, and STUART, JJ., concur.
SEE, J., dissents.
NOTES
[1] Southern Pine called no witnesses at trial.
[2] "`An electric cooperative is a "public utility."'" Baldwin County Elec. Membership Corp. v. Lee, 804 So.2d 1087, 1090 n. 4 (Ala.2001) (quoting Mitchell v. Concerned Citizens of CVEC, Inc., 486 So.2d 1283, 1285 (Ala.1986)). See also Alabama Power Co. v. Cullman County Elec. Membership Corp., 234 Ala. 396, 174 So. 866 (1937).
[3] During the other two weeks, he was away from home on business.
[4] Southern Pine does not challenge the materiality of evidence of its post-termination conduct to the issue of punitive damages.